[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
10/26/99
THOMAS  K. KAHN
CLERK**

_____

No. 98-6069

_____

D. C. Docket No. CV-97-AR-92-S

PATRICIA GARRETT,

Plaintiff-Appellant,

versus

THE UNIVERSITY OF ALABAMA
AT BIRMINGHAM BOARD OF TRUSTEES,

Defendant-Appellee.

THE UNITED STATES OF AMERICA,

Intervenor.

_____

No. 98-6070

_____

D. C. Docket No. CV-97-AR-2179-S

MILTON ASH,

Plaintiff-Appellant,

versus

ALABAMA DEPARTMENT OF YOUTH SERVICES,

THE UNITED STATES OF AMERICA,

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

**(October 26, 1999)**

Before ANDERSON, Chief Judge, RONEY, Senior Circuit Judge, and COOK[*],
Senior District Judge.

RONEY, Senior Circuit Judge:

These two consolidated cases appeal the grant of summary judgments to two

defendant Alabama state agencies on the ground of sovereign immunity. They raise

the question that is being litigated in various jurisdictions of whether a state is immune

from suits by state employees asserting rights under certain federal laws. The three

statutes here are: the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-

12213; Section 504 of the Rehabilitation Act of 1973 (Rehabilitation Act), 29 U.S.C.

§ 794; and the Family Medical Leave Act of 1993 (FMLA), 29 U.S.C. §§ 2601-2654.

Following recent precedent in this Circuit, we hold that the state is not immune from

_____
[*]   Honorable Julian Abele Cook, Jr., Senior U. S. District Judge for the Eastern District
of Michigan, sitting by designation.

suit under the ADA and the Rehabilitation Act and reverse the judgments of the district court against plaintiffs Patricia Garrett and Milton Ash as to those two statutes and remand the two cases for further proceedings. As to the FMLA, we hold that, although it might well not be immune from suit under certain other provisions of the Act, a decision we need not make, the state is immune from suit under the specific provisions at issue here. We therefore affirm the district court as to the summary judgment on that cause of action against plaintiff Patricia Garrett, the only plaintiff to make a claim under the FMLA.

Although generally called Eleventh Amendment immunity, which amendment simply bars a federal court from hearing claims against a state by a citizen of another state,[1] it has long been recognized that each state is a sovereign entity in our federal system and is not amenable to suit by an individual without its consent. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44,54 (1996) and *Hans v. Louisiana,* 134 U.S. 1 (1890).

Under certain circumstances, however, the United States Congress can pass laws which give individual citizens a right of action in federal court against an unconsenting state. Those circumstances require first, that "Congress has

---

[1]The Judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens of Subjects of any Foreign State.
U.S. Const. amend. XI.

'unequivocally expresse[d] its intent to abrogate the immunity,'" which "must be obvious from 'a clear legislative statement,'" and second, that Congress has acted "pursuant to a valid exercise of power." *Seminole Tribe of Florida v. Florida*, 517 U.S. at 55.

So far, the Supreme Court has held that Congress can abrogate state immunity only when it acts pursuant to section 5, the enforcement provision of the Fourteenth Amendment to the Constitution, which provides that "[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend. XIV, § 5. The Court has held that Congress does *not* have authority to abrogate state sovereign immunity when it acted only pursuant to the Commerce Clause. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996).

This frames the issue in this field of developing law: were these three statutes passed with the unequivocal and clear intent to give individuals a right of action against a state, and do these statutes reflect a valid exercise of congressional power under the Fourteenth Amendment.

The Supreme Court has laid out a few guidelines in recent cases. In *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Court struck down the Religious Freedom Restoration Act of 1993(RFRA), 42 U.S.C. § 2000bb-1(1994), an act that Congress purportedly passed pursuant to its Fourteenth Amendment enforcement powers, and

in direct response to the Supreme Court's decision in *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872(1990). In *Smith*, the Court had held that the Free Exercise Clause of the First Amendment does not require states to justify by a compelling interest generally applicable, neutral laws that coincidentally burden religious practices. *See Smith*, 494 U.S. at 885-887. In direct response to *Smith*, Congress passed RFRA, which required all laws that burden a group's religion, even neutral laws of general applicability, to be narrowly tailored and justified by a compelling interest. *See* 42 U.S.C. § 2000bb-1. In striking down RFRA, the Supreme Court warned that section 5 of the Fourteenth Amendment grants Congress power to enforce the Fourteenth Amendment, not to define the substance of the amendment, so that Congress' power is remedial in nature. *See Boerne*, 521 U.S. at 519. To qualify as remedial, "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." 521 U.S. at 520.

In *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank*, _ U.S. _, 119 S.Ct. 2199(1999), a patentee brought an action against a state agency alleging infringement of a patented apparatus and method for administering college investment programs. The Court held that the Patent and Plant Variety Protection Remedy Clarification Act could not be sustained under the *City of Boerne* analysis as legislation enacted to enforce any guarantee of the Fourteenth Amendment. *See*

*College Savings Bank*,_ U.S. at _, 119 S.Ct. at 2202. In looking at whether the Patent Remedy Act was *remedial* or *preventive* legislation, the Court stated, "we must first identify the Fourteenth Amendment 'evil' or 'wrong' that Congress intended to remedy, guided by the principle that the propriety of § 5 legislation 'must be judged with reference to the historical experience . . . it reflects.'" *College Savings Bank, _* U.S. at _, 119 S.Ct. at 2207, *citing City of Boerne*, 521 U.S. at 525. The Court then looked to the legislative history to see if there was evidence of a pattern of constitutional violations perpetrated by the states, such as there were in the voting rights cases, and found none. The Court noted that Congress barely considered the availability and constitutional adequacy of state law remedies. The Court noted that while the "lack of support in the legislative record is not determinative . . . identifying the targeted constitutional wrong or evil is still a critical part of our §5 calculus. . . . " _ U.S. at _, 119 S.Ct. at 2209. The Court said that the record offered only "scant support for Congress' conclusion that states were depriving patent owners of property without due process of law by pleading sovereign immunity in federal court patent actions. _ U.S. at _, 119 S.Ct. at 2209.

With these guidelines in mind, we consider each of the acts at issue in this case.

## I.  The ADA

Congress having unequivocally expressed its intent for the ADA to abrogate sovereign immunity, 42 U.S.C. § 12202 (1994) ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of [the ADA]."),  this Court in  *Kimel v. State Bd. of Regents* 139 F.3d 1426, 1433 (11th Cir.1998), *cert. granted*, _U.S. _, 119 S.Ct. 901(Jan. 25, 1999) has already held that the ADA is a valid exercise of the Enforcement Clause of the Fourteenth Amendment and that the states do not have sovereign immunity from claims brought under the ADA.  We note that *Kimel* reversed a district court decision and was decided by our Court after the district court had  made its determination in this case.  We, of course,  are bound by the decision of the Court in *Kimel.  See United States v. Woodard*, 938 F.2d 1255, 1258 (11th Cir.1991), *cert. denied*, 501 U.S.  1109(1992). We note also that certiorari has been granted in *Kimel* and any resulting  decision of the Supreme Court will probably catch up with this case before a final determination of the merits of the plaintiffs' claims.

We, therefore, reverse the summary judgment entered for the University of Alabama at Birmingham Board of Trustees and against Patricia Garrett on her ADA claim in Appeal No. 98-6090 (D.C. Docket No CV-97-AR-92-S), and the summary

7

judgment for the Alabama Department of Youth Services and against Milton Ash on his ADA claim in Appeal No. 98-6070 (D.C.Docket No. CV-97-AR-2179-S), and remand for further proceedings.

## II.    The Rehabilitation Act

In our judgment,  the decision under the Rehabilitation Act is also controlled by this court's decision as to the ADA in *Kimel*.  The language of the Rehabilitation Act as to congressional intent to abrogate a states' immunity from suit in federal court is as clear as it was under the ADA.  *See* 42 U.S.C. § 2000d-7(a)(1) (1994) ("A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of Section 504 of the Rehabilitation Act of 1973 ....").   The statutes serve the same purpose and were born of the same history of discrimination:

> The Supreme Court has previously held that the disabled are protected against discrimination by the Equal Protection Clause. *See City of Cleburne,* 473 U.S. at  450, 105 S. Ct. at 3259-60.  Here, the purpose of both the ADA and section 504 of the Rehabilitation Act is to prohibit discrimination against the disabled.  *See* 42 U.S.C. § 12101(b)(ADA); 29 U.S.C. 701(b)(1)(F)(Rehabilitation Act).  In both acts, Congress explicitly found that persons with disabilities have suffered discrimination. *See* 42 U.S.C. 12101(a)(ADA);29 U.S.C. § 701 (a)(5)(Rehabilitation Act).  Both the ADA and the Rehabilitation Act therefore are within the scope of appropriate legislation under the Equal Protection Clause as defined by the Supreme Court.

*Clark v. State of California*, 123 F.3d 1267,1270 (9th Cir. 1997), *cert. denied,* _U.S.

_, 118 S.Ct. 2340(1998).

We, therefore, reverse the summary judgment entered for the University of Alabama at Birmingham Board of Trustees and against Patricia Garrett on her Rehabilitation Act claim in Appeal No. 98-6090 (D.C. Docket No CV-97-AR-92-S), and the summary judgment for the Alabama Department of Youth Services and against Milton Ash on his Rehabilitation Act claim in Appeal No. 98-6070 (D.C.Docket No. CV-97-AR-2179-S), and remand for further proceedings.

III. **FMLA**

Patricia Garrett is the only plaintiff in this consolidated appeal who asserts a claim under the FMLA. Although the FMLA may be most commonly known for its provisions affording employees leave for the birth or adoption of a child or to care for a child, spouse or parent with a serious health condition, the provision at issue here deals with leave for the employee due to her own serious health condition. *See* 29 U.S.C. § 2612(a)(1)(D)("[A]n eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee.")

Plaintiff Patricia Garrett had worked for the University of Alabama since 1977 and had received several promotions, including one as recently as June 1992, when she was promoted to Director of OB/GYN/Neonatal Services. In August 1994, Garrett was diagnosed with breast cancer and underwent a lumpectomy and continued radiation and chemotherapy treatment through January 1995. Garrett alleges the University of Alabama repeatedly threatened to transfer her to a less demanding job due to her condition. In March 1995, after being told that a subordinate was going to replace her and that she would be sent to a satellite location, Garrett took family medical leave, upon doctor's orders. When she returned, the University demoted her to a position with a significantly lower salary.

Garrett alleges that the University of Alabama violated the FMLA by failing to offer her the same or an equivalent position upon her return, and that the university's actions constitute retaliation under that statute. She seeks damages and equitable relief. The merits of that claim are, of course, not before this Court.

The expression of congressional intent in the FMLA is less clear than in the ADA and the Rehabilitation Act. Plaintiffs rely upon the fact that the FMLA defines an employer to include a state or state entity, *see* 29 U.S.C. § 2611(3), 203(e)(2)(c), and the statute's enforcement provision, which provides that "any employer" who violates the FMLA shall be liable for a variety of penalties including "wages, salary,

employment benefits . . . liquidated damages ... and for such equitable relief as may be appropriate...." 29 U.S.C. § 2617. Judge Edmondson rejected a virtually identical argument with regard to the ADEA. *See Kimel*, 139 F.3d at 1431-32. *Accord Humenansky v. Regents of the Univ. of Minnesota*, 152 F.3d 822 (8th Cir.1998), *pet.for cert. filed,* 67 U.S.L.W. 3504 (Feb. 1, 1999). *But see Cooper v. New York State Office of Mental Health*, 162 F.3d 770 (2d Cir. 1998), *pet. for cert. filed,* 67 U.S.L.W. 3614(Mar. 23,1999) ; *Scott v. Univ. of Mississippi*, 148 F.3d 493 (5th Cir. 1998); *Coger v. Board of Regents*, 154 F.3d 296 (6th Cir. 1998), *pet. for cert. filed,* 67 U.S.L.W. 3364 (Nov. 16,1998); *Goshtasby v. Board of Trustees*, 141 F.3d 761 (7th Cir. 1998); *Keeton v. Univ. of Nevada Sys.*, 150 F.3d 1055 (9th Cir. 1998); *Migneault v. Peck*, 158 F.3d 1131 (10th Cir. 1998), *pet. for cert. filed,* 67 U.S.L.W. 3496 (Jan.20,1999).

Without deciding this issue, which the Supreme Court will probably resolve in consideration of its grant of certiorari in *Kimel,* we hold in this case that Congress did not have the authority to abrogate the sovereign immunity of the states on claims arising under the provision at issue here. Thus we affirm the district court under the second prong of the test set forth in *Seminole Tribe of Florida*, 517 U.S. at 54 (1996).

In discussing Congress' enforcement power, the Supreme Court emphasized that its power is "remedial." *City of Boerne*, 521 U.S. at 519. Congress acts within its

11

authority under the Fourteenth Amendment if the court can perceive a basis upon which Congress might predicate a judgment that the state action "constituted an invidious discrimination in violation of the Equal Protection Clause." *Katzenbach,* 384 U.S. at 656. In other words, "we must first identify the Fourteenth Amendment 'evil' or 'wrong' that Congress intended to remedy, guided by the principle that the propriety of any § 5 legislation 'must be judged with reference to the historical experience . . . it reflects.'" *College Savings Bank,* _U.S. at _, 119 S.Ct. at 2207, *citing City of Boerne,* 521 U.S. at 525.

Although the statute invokes the Equal Protection Clause in its purpose section, it is not in relation to the provision allowing leave to an employee with a serious health condition.

The statute states as its first two purposes:

(1) to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity;

(2) to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse or parent who has a serious health condition.

29 U.S.C. § 2601(b)(1),(2).

The statute seeks to accomplish these purposes

(4) . . . in a manner that, consistent with the Equal Protection Clause of the Fourteenth Amendment, minimizes the potential for employment discrimination on the basis of sex by ensuring generally that leave is

available for eligible medical reasons(including maternity-related disability) and for compelling family reasons, on a gender-neutral basis; and

(5) to promote the goal of equal employment opportunity for women and men, pursuant to such clause.

29 U.S.C. § 2601(b)(4),(5).

In reviewing the legislative history, we found only scant references to this provision. Serious health conditions are not necessarily related to family and gender discrimination. Plaintiffs pointed us to passages of the Senate Report, which contained the story of a cancer patient who, despite her good work history was fired after developing colon cancer; and to the more extensive testimony of the vice president of the National Coalition for Cancer Survivorship, who testified with regard to the type and underlying causes of discrimination suffered by cancer survivors. She also testified that "25 percent of all cancer survivors, over one million Americans, experience some form of employment discrimination solely because of their cancer history." This type of anecdotal legislative history is insufficient to indicate Congress had identified particular unconstitutional actions by the states involving serious health conditions irrespective of gender or family situations.

Plaintiffs contend that one of the FMLA's principal purposes is to prevent gender discrimination and to protect women from employment discrimination due to issues regarding pregnancy, child care, and caretaking of family members. Assuming

13

this is so, plaintiffs have failed to make even a faint connection between this purpose and the particular section of the statute under review.

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED.**

COOK, Senior District Judge, concurring in part and dissenting in part:

## I.

I concur with my brethren that the decision below with respect to the Americans With Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213, and Section 504 of the Rehabilitation Act of 1973 (Rehabilitation Act), 29 U.S.C. § 794, must be reversed because this circuit's prior decision in Kimel v. State of Florida Board of Regents, 139 F.3d 1426 (11th Cir. 1998), is controlling.[1]

## II.

However, I respectfully dissent from the holding that the States' Eleventh Amendment immunity was not validly abrogated by the provisions of the Family Medical Leave Act of 1993 (FMLA), 29 U.S.C. §§ 2601-2654, which are at issue in the case brought by the Appellant, Patricia Garrett, against the Appellee, the Board of Trustees for the University of Alabama in Birmingham (UAB).

## A.

---

[1]See also Seaborn v. State of Florida Dep't Corrections, 143 F.3d 1405, 1407 (11th Cir. 1998).

The outcome of this appeal is governed by the analytical framework that the Supreme Court has established with regard to the Eleventh Amendment grant of immunity to the states from federal court litigation, and the abrogation thereof pursuant to Section Five of the Fourteenth Amendment. The Eleventh Amendment reads:

> [t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

"While the Amendment by its terms does not bar suits against a State by its own citizens, this Court has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." Edelman v. Jordan, 415 U.S. 651, 662-63 (1974). The Eleventh Amendment also immunizes state agents and state instrumentalities. Regents of Univ. of Cal. v. Doe, 519 U.S. 425, 429 (1997). However, the Eleventh Amendment does not prohibit federal courts from entertaining private actions against state officers for injunctive relief. See Ex Parte Young, 209 U.S. 123 (1908).

The Supreme Court considered the scope of the states' Eleventh Amendment immunity in Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996). In the course of that decision, the Court validated a two-part test to determine "whether Congress has abrogated the States' sovereign immunity . . . first, whether Congress has

'unequivocally expresse[d] its intent to abrogate the immunity,' and second, whether Congress has acted 'pursuant to a valid exercise of power.' " Id. at 55 (citation omitted) (quoting Green v. Mansour, 474 U.S. 64, 68 (1985)). Although the Court overruled Pennsylvania v. Union Gas Co., 491 U.S. 1 (1989), by holding that the Interstate Commerce Clause, U.S. Const. Art. I, § 8, cl. 3, did not empower Congress to unilaterally abrogate the Eleventh Amendment's grant of state immunity, it recognized that Section Five of the Fourteenth Amendment was a valid means of doing so. Seminole Tribe, 517 U.S. at 59-66. Section Five of the Fourteenth Amendment provides that "[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article," U.S. Const. amend. XIV, § 5, which includes the guarantee that "[n]o State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws," U.S. Const. amend. XIV, § 1.

The Supreme Court has provided guidance concerning the circumstances in which Congress may validly invoke the Fourteenth Amendment's Equal Protection Clause to abrogate the immunity granted to states by the Eleventh Amendment. The test is whether the statute (1) may be regarded as an enactment to enforce the Equal Protection Clause, (2) is plainly adapted to that end, and (3) is not prohibited by, but

is consistent with, the letter and spirit of the Constitution. <u>Katzenbach v. Morgan</u>, 384 U.S. 641, 651 (1966).

Recently, the Supreme Court in <u>City of Boerne v. Flores</u>, 521 U.S. 507 (1997), added constraints to this test by emphasizing that the power granted to Congress by Section Five of the Fourteenth Amendment was (1) an enforcement or remedial authority, as opposed to a license to substantively define the Fourteenth Amendment's protections, and (2) limited by a requirement of congruence or proportionality between the relevant legislation and the injury sought to be remedied or prevented. Although the Supreme Court did not so specify, it appears that these considerations apply to the second and third <u>Morgan</u> factors.

<u>Flores</u> presented the issue of whether the Religious Freedom Restoration Act of 1993 (RFRA) was validly promulgated under Congress' Fourteenth Amendment power to enforce the Free Exercise Clause. Through the RFRA, Congress had invoked its power under Section Five of the Fourteenth Amendment in an effort to counteract the Supreme Court's decision in <u>Employment Division, Department of Human Resources of Oregon v. Smith</u>, 494 U.S. 872 (1990), which held that neutral, generally applicable laws may be applied to inhibit religious practices even when not supported by a compelling governmental interest. <u>Flores</u>, 521 U.S. at 512-14. Reviewing Fourteenth Amendment jurisprudence, the Supreme Court emphasized that

18

Congress is granted an enforcement, or remedial, power under the Fourteenth

Amendment, but that:

> [t]he design of the Amendment and the text of § 5 are inconsistent with the suggestion that Congress has the power to decree the substance of the Fourteenth Amendment's restrictions on the States. Legislation which alters the meaning of the Free Exercise Clause cannot be said to be enforcing the Clause. Congress does not enforce a constitutional right by changing what the right is. It has been given the power "to enforce," not the power to determine what constitutes a constitutional violation.

Flores, 521 U.S. at 519. The Court found that (1) "[t]he remedial and preventive

nature of Congress' enforcement power, and the limitation inherent in the power, were

confirmed in our earliest cases on the Fourteenth Amendment," and further (2) "[a]ny

suggestion that Congress has a substantive, non-remedial power under the Fourteenth

Amendment is not supported by our case law." Id. at 524, 527. The limits to

Congress' Fourteenth Amendment powers are necessary because:

> [i]f Congress could define its own powers by altering the Fourteenth Amendment's meaning, no longer would the Constitution be "superior paramount law, unchangeable by ordinary means." It would be "on a level with ordinary legislative acts, and, like other acts, . . . alterable when the legislature shall please to alter it." Under this approach, it is difficult to conceive of a principle that would limit congressional power. Shifting legislative majorities could change the Constitution and effectively circumvent the difficult and detailed amendment process contained in Article V.

Id. at 529 (citation omitted) (quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177

(1803)).

19

The Supreme Court recognized that, as with many constitutional doctrines, application of these abstract principles to specific facts can be difficult.

> While the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, and Congress must have wide latitude in determining where it lies, the distinction exists and must be observed.

Flores, 521 U.S. at 519-20. The Flores majority emphasized the necessity, when making these distinctions, of assuring a "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end" because "[l]acking such a connection, legislation may become [impermissibly] substantive in operation and effect." Id. at 520. This theme of proportionality between the statutory means and the ends to be achieved was repeated throughout the opinion, see id. at 530, 533, and was indeed the determinative factor in the Court's analysis of the RFRA, see id. at 532. Thus, the Court held that Congress exceeded its enforcement or remedial powers under the Fourteenth Amendment when it enacted the RFRA because

> RFRA cannot be considered remedial, preventive legislation, if those terms are to have any meaning. RFRA is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior. It appears, instead, to attempt a substantive change in constitutional protections. . . .
>     . . . Sweeping coverage ensures its intrusion at every level of government, displacing laws and prohibiting official actions of almost every description and regardless of subject matter. RFRA's restrictions apply to every agency and official of the Federal, State, and local Governments. RFRA applies to all federal and state law, statutory or

20

otherwise, whether adopted before or after its enactment. RFRA has no termination date or termination mechanism. Any law is subject to challenge at any time by any individual who alleges a substantial burden on his or her free exercise of religion.

. . . .

The substantial costs RFRA exacts, both in practical terms of imposing a heavy litigation burden on the States and in terms of curtailing their traditional general regulatory power, far exceed any pattern or practice of unconstitutional conduct under the Free Exercise Clause . . . . Simply put, RFRA is not designed to identify and counteract state laws likely to be unconstitutional because of their treatment of religion.

Id. at 532, 534. In sum, because of the necessity for proportionality between the injury and the statutory remedy, the Supreme Court concluded that there had been an insufficient showing that religious bias was a pervasive enough problem to warrant the sweeping applicability of the RFRA. See id. at 530-32.

B.

The FMLA sets national minimum standards for family and medical leave in employment. In specified situations, such as when oneself or a family member requires care due to a serious health problem or pregnancy-related issue, the FMLA requires covered employers to provide twelve weeks of unpaid leave per year. See 29 U.S.C. § 2612(a). Employers must place an employee returning from such leave into the position that had been held when the leave commenced, or to an equivalent position. 29 U.S.C. § 2614(a). Inhibiting covered employees from exercising their

21

FMLA rights, or retaliating against them for doing so, is prohibited. See 29 U.S.C. § 2615(a).

In the present appeal, the District Court ruled that Congress lacked authority under the Fourteenth Amendment to make the States subject to a private damages suit in federal court for asserted FMLA violations.[2] Garrett, 989 F. Supp. at 1412. Although it acknowledged that the FMLA had an explicit goal of assuring equal protection, the court below simply considered those statutory declarations "self-serving" and "insufficient to accomplish [the FMLA's] purpose." Garrett, 989 F. Supp. at 1412. In my opinion this holding was erroneous because Congress validly abrogated the States' Eleventh Amendment immunity when it passed the FMLA.

(1)

I would answer the first Seminole Tribe inquiry, which asks whether Congress unequivocally expressed its intent to abrogate the immunity granted to the states by the Eleventh Amendment, Seminole Tribe, 517 U.S. at 55, in the affirmative. This intent "must be obvious from 'a clear legislative statement,' " id. (quoting Blatchford v. Native Village of Noatak, 501 U.S. 775, 786 (1991)), and " 'unmistakably clear in

---

[2]Three other district courts that have considered the issue have reached the same result. Driesse v. Florida Bd. of Regents, 26 F. Supp. 2d 1328 (M.D. Fla. 1998); McGregor v. Goord, 18 F. Supp. 2d 204 (N.D.N.Y. 1998); Thomson v. Ohio State Univ. Hosp., 5 F. Supp. 2d 574 (S.D. Ohio 1998).

the language of the statute,' " Dellmuth v. Muth, 491 U.S. 223, 227-28 (1989) (quoting Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 242 (1985)). "[E]vidence of congressional intent must be both unequivocal and textual." Dellmuth, 491 U.S. at 230. The FMLA satisfies this test.

The FMLA defines an "employer" to "include[] any 'public agency,' as defined in section 203(x) of this title." 29 U.S.C. § 2611(4)(A)(iii). Section 203(x), which is actually part of the Fair Labor Standards Act (FLSA), defines "public agency" as including "the government of a State or political subdivision thereof; . . . a State, or a political subdivision of a State" 29 U.S.C. § 203(x). Similarly, the word "employee" is defined to encompass "any individual employed by an employer," and the FMLA further specifies that "[i]n the case of an individual employed by a public agency," the term refers, with certain exceptions not relevant here, to "any individual employed by a State, [or] political subdivision of a State." 29 U.S.C. §§ 2611(3), 203(e)(1), 203(e)(2)(C). These FMLA provisions unmistakably intend to subject state employers to the Act's protections.

Any doubt as to whether Congress intended to authorize damages to be claimed against the states pursuant to a private FMLA suit in federal court, which would necessarily require the abrogation of the Eleventh Amendment's immunity, is erased by the FMLA's enforcement provisions. One of those provides that any covered

employer violating the Act will be subject to a suit for damages by any covered employee. 29 U.S.C. § 2617(a)(1)(A). Importantly, another states that:

> [a]n action to recover the damages or equitable relief prescribed in paragraph (1) may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees.

29 U.S.C. § 2617(a)(2).

UAB argues that these textual provisions do not sufficiently demonstrate a congressional intention to abrogate the Eleventh Amendment. According to UAB, the statutory cross-referencing that is necessary to discern that a "public agency" includes state governmental employers is fatal to such a finding. However, this does not provide a principled basis for disposing of the issue. For example, as UAB recognizes, in Seminole Tribe the Supreme Court found a clear legislative intent to abrogate the Eleventh Amendment based on repeated references to the state and the remedies made available against it in numerous subsections of a particular federal statute. Seminole Tribe, 517 U.S. at 56-57 (reviewing subsections (A)(I), (B)(ii)(II), (B)(iii), (B)(iv), (B)(v), (B)(vi), and (B)(vii) of 25 U.S.C. § 2710(d)(7)); see also Fitzpatrick v. Bitzer, 427 U.S. 445, 448-49 & n.2 (1976). The reason why numerous subsections of one statute, when read together, could be deemed sufficient to indicate an intent to abrogate, but cross-references to various statutes could not, is a mystery. Such an approach would violate the familiar command that statutes are to be read as

24

a whole. "We believe it fundamental that a section of a statute should not be read in isolation from the context of the whole Act, and that in fulfilling our responsibility in interpreting legislation, we must not be guided by a single sentence or member of a sentence, but (should) look to the provisions of the whole law, and to its object and policy. " Richards v. United States, 369 U.S. 1, 11 (1962) (footnotes and internal quotations omitted). An exception to this general principle is not warranted out of deference for the Eleventh Amendment and the important role that sovereignty plays in the federal system. As UAB acknowledges, Congress is not required to use the "magic words" in order to effectively overcome the Eleventh Amendment. Varner v. Illinois State Univ., 150 F.3d 706, 711 (7th Cir. 1998); Ussery v. Louisiana, 150 F.3d 431, 435 (5th Cir. 1998); see also EEOC v. Wyoming, 460 U.S. 226, 243 n.18 (1983).

UAB asserts that the FMLA's explicit grant of federal court jurisdiction to enforcement suits by the Secretary of Labor for either damages or injunctive relief, 29 U.S.C. §§ 2617(b)(2), (d), supports its position that § 2617(a)(2) only created a cause of action for damages in federal court against public agencies that are not shielded from such actions by the Eleventh Amendment because otherwise the latter would have equally explicit language as the former. Essentially, UAB argues that an abrogation of the Eleventh Amendment may occur only when an act of Congress contains an explicit and separate statutory grant of jurisdiction in federal court for

private damages suits against the states. That contention is but a repackaging of the already discredited "magic words" argument. The plain language of § 2617(a)(2) is perfectly clear: "[a]n action to recover . . . damages . . may be maintained against any employer (including a public agency) in any Federal . . . court of competent jurisdiction by any one or more employees." The fact that § 2617(a)(2) also grants state courts jurisdiction over FMLA suits, as well as federal court jurisdiction over suits seeking equitable relief, does not provide a basis for ignoring its language that an employee may bring a private cause of action for damages in federal court. UAB's argument that <u>Blatchford</u> supports its reasoning must be rejected. In <u>Blatchford</u>, the Supreme Court ruled that the Eleventh Amendment was not abrogated based on a general grant of federal jurisdiction over "all civil actions." 501 U.S. at 786. By contrast, § 2617(a)(2) clearly does more than merely provide a general grant of jurisdiction in federal court.

Two cases that UAB heavily relies upon do not support the conclusion that Congress failed to unequivocally demonstrate its intent to abrogate the Eleventh Amendment through the FMLA. The first is <u>Dellmuth</u>.[3] That decision implied that

---

[3]In <u>Dellmuth</u>, the Supreme Court concluded that three provisions of the Education of the Handicapped Act (EHA) did not suffice to indicate a clear intent to abrogate the Eleventh Amendment: (1) the preamble, which provided that it was in the national interest for the federal government to assist the states in the subject area in question, (2) a statute, which allowed an aggrieved party to bring a civil action in federal court under the EHA, and (3) a 1987 amendment, which clarified that a provision reducing attorney's fees would not apply if a state agency

26

a clear provision concerning the parties which are subject to suit under the Education of the Handicapped Act might suffice as an expression of intent to abrogate the Eleventh Amendment. <u>Dellmuth</u>, 491 U.S. at 231. As set forth above, the FMLA unquestionably contains such a provision, which clearly includes state employers within its coverage. 29 U.S.C. §§ 2617(a)(1)(A), (a)(2).

The second case that UAB emphasizes is <u>Kimel</u>. According to UAB, <u>Kimel</u>, where this circuit held that the Age Discrimination in Employment Act (ADEA) did not abrogate the Eleventh Amendment, has effectively answered the same issue with respect to the FMLA because the two Acts contain similar relevant statutory language. But UAB overstates the holding in <u>Kimel</u>, where only one member of the panel, Judge Edmondson, held that Congress had failed to sufficiently indicate its intent to abrogate the Eleventh Amendment with the ADEA. <u>Kimel</u>, 139 F.3d at 1430-33. Another member of the panel, Judge Cox, although agreeing with the conclusion that the states' Eleventh Amendment immunity was not abrogated by the ADEA, expressly declined to rule on whether a sufficient intent to abrogate was evident in that Act. <u>Kimel</u>, 139 F.3d at 1444-45. The third panel member, Chief Judge Hatchett, dissented on this issue, concluding that "Congress effectively abrogated the states' sovereign

unreasonably protracted the final resolution of the litigation or a violation of the EHA had occurred. <u>Dellmuth</u>, 491 U.S. at 228, 231-32.

27

immunity under the Eleventh Amendment." Kimel, 139 F.3d at 1434-35. Thus, Kimel does not control on the issue of intent to abrogate.

Moreover, Judge Edmondson's position in Kimel is unpersuasive because it accepts that a sufficient intent to abrogate cannot be discerned from reading in concert separate statutory provisions in an Act of Congress.

> This statutory structure does not provide the clarity needed to abrogate States' constitutional right to sovereign immunity. For abrogation to be unmistakably clear, it should not first be necessary to fit together various sections of the statute to create an expression from which one might infer an intent to abrogate. Although we make no definite rule about it, the need to construe one section with another, by its very nature, hints that no unmistakable or unequivocal declaration is present.

Kimel, 139 F.3d at 1431; accord Driesse v. Florida Bd. of Regents, 26 F. Supp. 2d 1328, 1331-32 (M.D. Fla. 1998). As explained above, such an approach unjustifiably creates an Eleventh Amendment exception to the axiom that federal Acts are to be read as a whole. Judge Edmondson also appears to have applied a more stringent textual requirement than is generally understood to apply to this first Seminole Tribe factor.

> No unequivocal expression of an intent to abrogate immunity is unmistakably clear in the ADEA. No reference to the Eleventh Amendment or to States' sovereign immunity is included. Nor is there, in one place, a plain, declaratory statement that States can be sued by individuals in federal court. To me, an intent on the part of Congress to abrogate the States' constitutional right to immunity [in the ADEA] is not sufficiently clear to be effective under Eleventh Amendment jurisprudence.

28

Kimel, 139 F.3d at 1430-31. No less of a strict textualist than Justice Scalia has expressly disavowed such an approach. "I join the opinion of [four other Justices of] the Court, with the understanding that [their] reasoning does not preclude congressional elimination of sovereign immunity in statutory text that clearly subjects States to suit for monetary damages, though without explicit reference to state sovereign immunity or the Eleventh Amendment." Dellmuth, 491 U.S. at 233 (Scalia, J., concurring). For all these reasons, Kimel does not control on the issue of whether Congress sufficiently indicated an intent to abrogate the Eleventh Amendment when it passed the FMLA.

Importantly, Thomas v. Louisiana, 534 F.2d 613, 614 & n.4 (5th Cir. 1976),[4] lends support to the Garrett's position that Congress intended to abrogate Eleventh Amendment immunity through passage of the FMLA. As the Fifth Circuit recognized in Thomas, Congress amended the Fair Labor Standards Act (FLSA) by adding the following language for the express purpose of superseding a Supreme Court holding that the FLSA lacked a clear intent to abrogate:[5]

---

[4]Fifth Circuit Court of Appeals (Fifth Circuit) decisions issued before October 1, 1981 are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209-11 (11th Cir. 1981) (en banc).

[5]The Supreme Court had so ruled in Employees of the Department of Public Health & Welfare v. Department of Public Health & Welfare, 411 U.S. 279 (1973).

29

[a]ction to recover such liability may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.

Thomas, 534 F.2d at 614 & n.4 (quoting 29 U.S.C. § 216(b) (1970)).  This language is almost identical to that used by Congress in 29 U.S.C. § 2617(a)(2) of the FMLA. Moreover, when reviewing the current language from § 216(b) of the FLSA,[6] which remains substantially identical after further amendment, the Second Circuit Court of Appeals held that it "evince[d] a clear intent to abrogate the States' sovereign immunity by allowing suit in federal courts."  Close v. State of New York, 125 F.3d 31, 36 (2d Cir. 1997).  Therefore, when taken in conjunction with the FMLA's statutory provisions that identify state employees as potential plaintiffs and their state employers as potential defendants, I believe that the best result is to conclude that the FMLA contains an unmistakably clear intent to abrogate the states' Eleventh Amendment immunity.

(2)

---

[6]"An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."

In my opinion, the second Seminole Tribe factor, which asks whether Congress was acting pursuant to a valid exercise of power when it promulgated the FMLA, Seminole Tribe, 517 U.S. at 55, is also satisfied. Congress stated that the FMLA was being passed:

> (4) to accomplish the purposes described [herein] in a manner that, consistent with the Equal Protection Clause of the Fourteenth Amendment, minimizes the potential for employment discrimination on the basis of sex by ensuring generally that leave is available for eligible medical reasons (including maternity-related disability) and for compelling family reasons, on a gender-neutral basis; and
>
> (5) to promote the goal of equal employment opportunity for women and men, pursuant to such clause.

29 U.S.C. § 2601(b). This explicit invocation of the Fourteenth Amendment's Equal Protection clause is sufficient to establish that Congress was acting pursuant to Section Five of the Fourteenth Amendment when it passed the FMLA.[7] See Morgan,

---

[7]Additionally, the implementing regulations are as explicit that Congress acted pursuant to the authority granted it by the Fourteenth Amendment.

> . . . It was intended that the Act accomplish [its] purposes . . . in a manner consistent with the Equal Protection Clause of the Fourteenth Amendment in minimizing the potential for employment discrimination on the basis of sex, while promoting equal employment opportunity for men and women.

29 C.F.R. § 825.101(a). The legislative history also indicates that Congress was acting under the Fourteenth Amendment's Equal Protection Clause. S. Rep. No. 103-3, at 16 (1993), reprinted in 1993 U.S.C.C.A.N. 3, 18.

Further, the legislative history of the FMLA indicates that Congress was drawing on its Commerce Clause powers as well, in addition to the Fourteenth Amendment's Due Process Clause. Id. However, since the Commerce Clause does not authorize Congress to abrogate the Eleventh Amendment's grant of immunity, Seminole Tribe, 517 U.S. at 59-66, it is irrelevant to Garrett's appeal save for providing an independent basis for validating the FMLA's substantive provisions.

31

384 U.S. at 652. As the Supreme Court made clear in Seminole Tribe, 517 U.S. at 59-60, Section Five authorizes Congress to validly abrogate the Eleventh Amendment.

Therefore, the analysis proceeds to whether the FMLA was a valid exercise of Congress' Fourteenth Amendment power, and applies the three-part test from Morgan. Given that Congress has explicitly invoked the goal of equal protection when passing the FMLA, and supported that with extensive legislative findings regarding how the FMLA is designed to guard against gender and disability discrimination,[8] which are unquestionably goals of the Fourteenth Amendment, see United States v. Virginia, 518 U.S. 515, 533 (1996); Weinberger v. Wiesenfeld, 420 U.S. 636, 652 (1975), City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 446-47 (1985), it meets the first Morgan factor because it may be regarded as an enactment to enforce the Equal Protection Clause. See Wilson-Jones v. Caviness, 99 F.3d 203, 210 (6th Cir. 1996) (the simplest way to meet first Morgan test is "for Congress to declare explicitly that the legislation is passed to enforce Fourteenth Amendment rights").

The more difficult question is whether the FMLA satisfies the second and third Morgan factors, which require that the legislation be (1) plainly adapted to enforce the Equal Protection Clause of the Fourteenth Amendment, and (2) consistent with, and

---

[8]29 U.S.C. §§ 2601(a), (b)(4) & (5); 29 C.F.R. § 825.101(a); S. Rep. No. 103-3, at 5-12 (1993), reprinted in 1993 U.S.S.C.A.N. 3, 7-14; H.R. Rep. No. 103-8 (1993).

32

not prohibited by, the letter and spirit of the Constitution. These considerations are constrained by the Flores principles that the legislation must (1) be enforcing or remedial in nature, rather than an attempt to make a substantive change to the protections the Fourteenth Amendment affords, and (2) have a congruence and proportionality between the injury to be prevented and the means adopted to that end. The District Court summarily concluded that the FMLA failed these tests, without discussing the Morgan factors, and referred to the Flores guidelines that illuminate them only in passing.

> The tertiary reliance by [Garrett] on the FMLA implicates the same Congressional reasoning and authority that Congress employed in enacting the ADA and the Rehab Act, with the same result. Although the FMLA does not refer to Section 5 of the Fourteenth Amendment, it does speak of accomplishing its purpose of promoting family integrity "in a manner that, consistent with the Equal Protection Clause of the Fourteenth Amendment, minimizes the potential for employment discrimination on the basis of sex" and that it will "promote the goal of equal employment opportunity for women and men." 29 U.S.C. § 2601(b)(4) and (5). These statutory expressions are no more than self-serving declarations of the kind criticized in Flores. Although they do, perhaps, give the FMLA a better chance at asserting control over the FMLA-proscribed employment practices by states than does similarly self-serving language found in the ADA and the Rehab Act, this court finds this statutory language in the FMLA insufficient to accomplish its purpose.

Garrett, 989 F. Supp. at 1412.

Contrary to the district court's holding, the FMLA is a valid exercise of Congress' Fourteenth Amendment powers because it is a justified enforcement

33

measure to address sex and disability discrimination. Congress passed the FMLA in

response to employers' sex discrimination in the offering of employee leave time

based upon presuppositions about the roles of men and women in families and as

caretakers, and of the presupposed need of women and the disabled to time off due to

pregnancies and health problems, respectively. There can be no question that it is

unconstitutional under the Fourteenth Amendment for a state to discriminate on the

basis of sex stereotypes, see Virginia, 518 U.S. 533; Weinberger, 420 U.S. at 643, or

that the Fourteenth Amendment's protections extend to the disabled, see City of

Cleburne, 473 U.S. at 446-47.

Nevertheless, during its legislative inquiry Congress found that, due to societal

perceptions regarding family roles, employers who offered leave time to women

discriminated against men with regard to that employment benefit, either by not

offering it, granting a shorter amount than was made available to women, or

discouraging men from taking it.[9] Such discrimination against men is

---

[9]The House of Representatives found that "[d]espite the apparent conflict with Title VII of the Civil Rights Act, only 37 percent of the[] companies extend[ed] parental leave to fathers and often on a different (and less extended) basis than to mothers." H.R. Rep. No. 100-511, pt. 2, at 24 (1988); see also S. Rep. No. 103-3, at 14-15 (1993), reprinted in 1993 U.S.C.C.A.N. 3, 17 (noting 37% availability of "maternity" leave at businesses with more than 100 workers, compared to only 18% availability of "paternity" leave); 138 Cong. Rec. S12,095, S12,096 (daily ed. August 11, 1992) (remarks of Sen. Kennedy) (noting 1990 Bureau of Labor Statistics study which found that "only 18 percent of fathers at medium and large firms are covered by an unpaid paternity leave policy, and only 6 percent of fathers at small firms had the right to take leave"); The Parental and Medical Leave Act of 1987: Hearings Before the Subcomm. on Children, Families, Drugs and Alcoholism of the Senate Comm. on Labor and Human Resources, Part 2, 100th Cong. 536 (1987) [hereinafter

34

unconstitutional. "[A] father, no less than a mother, has a constitutionally protected right to the companionship, care, custody, and management of the children he has sired and raised." Weinberger, 420 U.S. at 652 (internal quotation and citation omitted).

By the same token, Congress also found that women experienced discrimination related to leave time, in that employers' perceptions that women served as caretakers and therefore were more likely to ask for leave time contributed to a decreased

Hearings: Leave Act of 1987, Part 2] (statement of Professor Susan Deller Ross, Georgetown University Law Center) ("[T]here are a number of studies . . . in which it's shown that employers in this country that are giving family leaves to their workers are not giving it non-discriminatorily, they are, by and large, giving it only to women, not to men. It's fairly flagrant discrimination."); The Parental and Medical Leave Act of 1986: Joint Hearing Before the Subcomm. on Labor Management Standards of the House Comm. on Education & Labor, 99th Cong. 146, 147 (1986) [hereinafter Hearings: Leave Act of 1986] (statement of Washington Council of Lawyers) ("Parental leave for fathers . . . is rare. . . . Where child-care leave policies do exist, men . . . receive notoriously discriminatory treatment in their request for such leave."); id. at 99, 101 n.2 (statement of Women's Legal Defense Fund, citing Catalyst, Report on a National Study of Parental Leaves, 30, 37 (1986)) ("[B]ecause of sex discrimination against men, some working fathers may find it more difficult than their female counterparts to be permitted to accommodate family responsibilities without suffering adverse employment consequences. In a recent study by Catalyst, an independent research firm, 51.8% of companies surveyed reported that they give parental leave to mothers, but only 37.0% reported that they provide such leave to fathers – even though such a sex-base differential clearly violates existing law."); id. at 21 (statement of Thomas Donahue for AFL-CIO) (drawing on national experience with union contracts and corroborating lack of policies permitting working fathers to take time off for family responsibilities). See generally Schafer v. Board of Public Education, 903 F.2d 243 (3d Cir. 1990) (male public school teacher challenged school board's policy of granting one year of child-rearing leave to female employees only); Knussman v. State of Maryland, 16 F. Supp. 2d 601 (D. Md. 1998) (male police officer challenged state's presumption that the mother is the "primary care giver" entitled to additional leave); Chavkin v. Santaella, 439 N.Y.S.2d 654 (App. Div. 1981) (male probation officer challenged city probation department's practice of allowing only female employees to use accrued sick leave to extend infant care leave).

35

willingness to hire women in the first instance or promote them.[10] In addition, women were rendered more vulnerable to this form of discrimination based on employer concerns that they would need leave time for pregnancies,[11] while the disabled suffered from it as well due to employer fears that the health problem would require time off or preclude a return to work after a medical absence.[12] Particularly relevant in this Eleventh Amendment context is that Congress found that public sector employees were suffering comparable sex discrimination problems with regard to

---

[10]138 Cong. Rec. H8226, H8227 (daily ed. September 10, 1992) (remarks of Rep. Hayes) ("Too often women experience the nightmare of going in to their employer with the news that they are pregnant. Although they are valued employees, up to the moment they became pregnant, suddenly they find themselves unwanted. . . . They are offered an unacceptable choice: Keep a job or raise a family."); Hearings: Leave Act of 1987, Part 2, supra note 9, at 173-74 (statement of Peggy Montes, Mayor's Commission on Women's Affairs, City of Chicago) ("Job opportunities for [women with children] are limited, and they often miss pay increases and promotions. The lack of uniform parental and medical leave policies in the work place has created an environment where discrimination is rampant. Very often we are contacted by women workers who are at risk of losing their jobs or have lost them because they are pregnant, [or] gave birth to a child . . . ."); Hearings: Leave Act of 1986, supra note 9, at 100 (statement of Women's Legal Defense Fund).

[11] Hearings: Leave Act of 1986, supra note 9, at 100 (statement of Women's Legal Defense Fund) ("Historically, denial or curtailment of women's employment opportunities has been traceable directly to the pervasive presumption that women are mothers first, and workers second. This prevailing ideology about women's roles has in turn justified discrimination against women when they are mothers or mothers-to-be."); id. at 36, 42 n.48 (statement of National Women's Political Caucus, pointing to amicus brief filed with the Supreme Court by the ACLU in California Federal Savings & Loan Ass'n v. Guerra, 479 U.S. 272, 275 (1987)) (stating provision of special legal protections "put women, not on a pedestal, but in a cage"; "[t]he assumption that women will become pregnant and leave the labor market is at the core of the sex stereotyping resulting in unfavorable disparate treatment of women in the workplace.") (internal quotation and citation omitted).

[12]S. Rep. No. 103-3, at 12 (1993) (testimony regarding employment discrimination against cancer survivors).

leave time as employees in the private sector.[13] Thus, through the FMLA Congress unquestionably sought to protect Fourteenth Amendment Equal Protection interests in response to a demonstrably pervasive discrimination problem.[14] Consequently, the concern in Flores, 521 U.S. at 530-32, that the RFRA was not implemented in response to a serious or demonstrated need to protect against religious bigotry is inapplicable to the FMLA.

Further, the FMLA's remedial measures are plainly adapted to enforce the interest in combatting sex and disability discrimination in employment and are consistent with, and not prohibited by, the letter and spirit of the constitution, within the Flores constraints of enforcement and proportionality. By setting a minimum standard for family leave for all eligible employees – male and female – the FMLA

---

[13]Hearings: Leave Act of 1986, supra note 9, at 30 (statement of Meryl Frank, Yale Bush Center) ("[P]ublic sector leaves don't vary very much from private sector leaves"); id. at 147 (1986) (statement of Washington Council of Lawyers) ("Parental leave for fathers . . . is rare. . . . Where child-care leave policies do exist, men, both in the public and private sectors, receive notoriously discriminatory treatment in their request for such leave.").

[14]Relevant here are two arguments UAB raises which may be quickly disposed of. First, UAB asserts that the FMLA is invalid because it does not protect the constitutional rights of members of a "suspect" or "discrete" class. Second, UAB contends that the FMLA is not an effort to remedy discrimination against a class of persons protected by the Fourteenth Amendment because it reaches all employees, regardless of whether they have been subjected to discrimination. As an initial matter, these arguments misunderstand the applicable jurisprudence. The guarantee of equal protection is not enjoyed only by those having a status that results in a higher standard of review. See Cleburne, 473 U.S. at 446-47 (disabled individuals enjoy equal protection guarantees despite that disability not a quasi-suspect class). Apart from that, UAB's arguments are incorrect since the FMLA protects against discrimination on the basis of sex and disability, which are protected classes under the Equal Protection clause.

extends to male workers the types of leave benefits more often available to working women.  Just as importantly, by providing male workers with the opportunity for parental leave, the FMLA "help[s] to eliminate the stereotype – no longer valid in today's working world – that women are exclusively responsible for childcare."[15]  In addition, by authorizing leave for all serious health conditions rather than only for pregnancy related disabilities, the FMLA discourages discrimination against women of childbearing age.[16]

UAB, by emphasizing the affirmative obligations that the FMLA places on employers and suggesting that this represents a substantive change in the protections the Fourteenth Amendment assures, argues that the FMLA is not merely remedial.[17] However, Congress determined that a mere negative imperative upon employers, in the form of a law prohibiting them from discriminating in the granting of employee leave time on the basis of sex, was insufficient because it had already proven inadequate under Title VII, which already mandated that employers who granted

---

[15]Hearings: Leave Act of 1986, supra note 9, at 147 (statement of Washington Council of Lawyers).

[16]S. Rep. No. 102-68, at 35 (1991) ("Because the bill treats all employees who are temporarily unable to work due to serious health conditions in the same fashion, it does not create the risk of discrimination against pregnant women posed by legislation which provides job protection only for pregnancy related disability.").

[17]This argument was accepted in Driesse, 26 F. Supp. 2d at 1333, McGregor, 18 F. Supp. 2d at 208, and Thomson, 5 F. Supp. 2d at 579-80, and apparently by the court below, Garrett, 989 F. Supp. at 1412.

38

parental leave had to do so equally between the sexes, see 42 U.S.C. § 2000e-2(a), and persisted despite protections such as the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), and 42 U.S.C. § 1983.[18] Moreover, the Title VII experience also taught Congress that a mere prohibition was impracticable because it placed too great of an enforcement burden upon employees: the costs of legal challenges to asserted violations were prohibitive, and for those who did not have this problem the time spent litigating negated any eventual positive result.[19]

This experience justifies Congress' choice to impose affirmative obligations upon employers through the FMLA and, contrary to UAB's position, distinguishes the FMLA from the concerns the Supreme Court in Flores used to invalidate the RFRA. For example, as even Flores recognized, broad and aggressive legislation in the voting rights context to enforce the constitutional guarantees against voting discrimination,

---

[18]See H.R. Rep. No. 103-8, pt. 1, at 28 (1993); H.R. Rep. No. 100-511, pt. 2, at 22, 24 (1988); Family and Medical Leave Act of 1987: Joint Hearing Before the Subcomm. on Civil Service and the Subcomm. on Compensation and Employee Benefits of the House Comm'n on Post Office and Civil Service, 100th Cong. 31, 32 (1987) (statement of Professor Eleanor Holmes Norton, Georgetown Univ. Law Center) (lack of consistency in employer leave policies based on sex "constitutes a prima facie case of violation of Title VII of the 1964 Civil Rights Act").

Several district courts have reasoned that since Congress had already established protections against this form of sex discrimination in employment, for example through Title VII actions or causes against state employers under 42 U.S.C. § 1983, the addition of the FMLA's remedies rendered that legislation incongruent. See Driesse, 26 F. Supp. 2d at 1333-34; Thomson, 5 F. Supp. 2d at 580. However, since Congress determined that these prior efforts to protect against sex discrimination in the offering of employee leave time had proved unsuccessful, the existence of those preexisting protections cannot serve as a basis to conclude that the FMLA lacks congruence.

[19]139 Cong. Rec. H387 (daily ed. February 3, 1993) (remarks of Rep. Ackerman concerning his lawsuit to obtain parental leave).

including an affirmative duty to submit changes in electoral practices to the Department of Justice for clearance,[20] were within Congress' Fourteenth Amendment powers because they were (1) aimed at actions "with a long history" as " 'notorious means to deny and abridge voting rights on racial grounds,' " and (2) *necessary given the ineffectiveness of the existing voting rights laws and the slow costly character of case-by-case litigation*." Flores, 521 U.S. at 526, 533 (emphasis added and citations omitted) (quoting South Carolina v. Katzenbach, 383 U.S. 301, 355 (1966) (Black, J., concurring and dissenting)). Congress found that an analogous situation existed with respect to sex discrimination in the offering of employee leave time. Given the ineffectiveness of prior attempts to assure compliance in this realm with the Fourteenth Amendment's guarantee of equal protection, Congress was within its powers to take more aggressive remedial measures.

> Congress, unlike any State or political subdivision, has a specific constitutional mandate to enforce the dictates of the Fourteenth Amendment. The power to "enforce" may at times also include the power to define situations which Congress determines threaten principles of equality and to adopt prophylactic rules to deal with those situations.

City of Richmond v. J.A. Croson Co., 488 U.S. 469, 490 (1989).

The Supreme Court in Flores warned that congressional invocations of the Fourteenth Amendment could lack the congruence necessary to their validity

---

[20]See City of Rome v. United States, 446 U.S. 156 (1980).

40

depending on the degree, and justification therefor, of their "intrusion into the States' traditional prerogatives and general authority to regulate for the health and welfare of their citizens." Flores, 521 U.S. at 534. The Thomson court appears to have invoked that principle by concluding that the FMLA represents "an inappropriate interference into a traditional area of state sovereignty which runs afoul of the spirit of the Constitution and the concepts of federalism which it contains." Thomson, 5 F. Supp. 2d at 581; see also Driesse, 26 F. Supp. 2d at 1334. However, Thomson and Driesse erred by failing to recognize that, although the regulation of employee leave time might be an area traditionally reserved to the states, Congress' belief that its prior efforts to prohibit unconstitutional sex discrimination in employee leave time, such as through Title VII and its later amendment by the Pregnancy Discrimination Act, 42 U.S.C. §§ 1983, 2000e(k), had been unsuccessful justified its conclusion that a blanket, fixed guarantee of leave time was necessary to "minimize[] the potential for employment discrimination on the basis of sex by ensuring generally that leave is available for eligible medical reasons (including maternity-related disability) and for compelling family reasons, on a gender-neutral basis." 29 U.S.C. § 2601(b)(4); see also 29 U.S.C. § 2601(a)(6) ("employment standards that apply to one gender only have serious potential for encouraging employers to discriminate against employees and applicants for employment who are of that gender"); S. Rep. No. 103-3, at 16

41

(1993), reprinted in 1993 U.S.C.C.A.N. 3, 18 ("A law providing special protection to women or any defined group, in addition to being inequitable, runs the risk of causing discriminatory treatment. S. 5, by addressing the needs of all workers, avoids such a risk"); H.R. Rep. No. 100-511, pt. 2, at 26 (1988)[21].

> Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into "legislative spheres of autonomy previously reserved to the States."

Flores, 521 U.S. at 518 (quoting Fitzpatrick, 427 U.S. at 455).

Given Congress' legislative findings as to the pervasive problem of sex discrimination in the offering of employee leave time, and lack of success with prior efforts to effectuate anti-discriminatory legislation on that issue, the FMLA's limited measures assure its congruence with the problem that it seeks to remedy and deter. The FMLA (1) applies only to firms employing fifty or more employees (which comprise approximately five per cent of businesses)[22] for at least twenty weeks during

---

[21]"Another significant benefit of the temporary medical leave provided by this legislation is the form of protection it offers women workers who bear children. Since all employees who are temporarily unable to work due to serious health conditions are treated the same under the bill, it does not create the risk of discrimination against pregnant women which is posed by legislation which provides job protection only for pregnant women. Legislation for pregnant women only give employers an economic incentive to discriminate against women in hiring policies; legislation helping all workers equally does not have this effect."

[22]See 138 Cong. Rec. S12,095-96 (daily ed. Aug. 11, 1992) (remarks of Sen. Kennedy).

a calendar year,[23] (2) protects only employees who have worked for a covered employer for at least one year, during which they must have worked at least 1,250 hours,[24] (3) guarantees only unpaid leave,[25] (4) requires covered employees to give thirty days advance notice of foreseeable leave requests, and in that instance mandates a reasonable effort not to unduly disrupt the employer's operations,[26] and (5) allows employers to require the certification of serious medical conditions.[27]  Thus, the FMLA certainly can be said to comply with its stated goal of assuring employee protections "in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b)(2).  Also significant for purposes of the Eleventh Amendment is that Congress found that compliance with the FMLA would be no more burdensome for state, as opposed to private, employers.[28]  Nevertheless, it demonstrated a

---

[23]29 U.S.C. § 2611(4)(A)(i).

[24]29 U.S.C. § 2611(2)(A).

[25]29 U.S.C. § 2612(c).

[26]29 U.S.C. § 2612(e).

[27]29 U.S.C. § 2613.
The extensive series of provisions limiting the scope and burden of the FMLA were noted in the legislative record.  138 Cong. Rec. S12,095-96 (daily ed. August 11, 1992) (remarks of Sen. Kennedy).

[28]Hearing on H.R. 770, the Family and Medical Leave Act of 1989: Hearing Before the Subcomm. on Labor-Management Relations of the House Comm. on Education and Labor, 101st Cong. 45, 53 (1989) (statement of Gerald McEntee, AFSCME) (based on its experience, AFSCME believed that "the FMLA will not levy significant additional costs on state and local governments and if government at all levels can adopt unpaid leave policies, then so can private industry");

concerted effort to minimize the burden that the FMLA did impose on state employers by excluding from its coverage state employees who hold certain high-ranking or sensitive positions. 29 U.S.C. §§ 2611(3), 203(e)(2)(C). The FMLA is therefore substantively distinguishable from the RFRA, which applied without restriction to all governmental acts, whether federal, state, or local, Flores, 521 U.S. at 532-34.

Further, although the district courts in Thomson, 5 F. Supp. 2d at 580, McGregor, 18 F. Supp. 2d at 209, and Driesse, 26 F. Supp. 2d at 1334, found fault with the FMLA on the basis that it imposes a significant financial burden on state employers, this assertion was based on mere speculation and is contrary to Congress' finding that family and medical leave is cost-effective because it results in decreased costs related to hiring, training, turnover, and absenteeism.[29] "When Congress makes findings on essentially factual issues . . . those findings are of course entitled to a great

Hearings: Leave Act of 1987, Part 2, supra note 9, at 305 (statement of Roberta Lynch, AFSCME) (belief that FMLA will not impose significant costs on government "is one of the major reasons why the National Conference of State Legislatures, which represents state legislatures in all 50 states, has endorsed this legislation"; noting "this leave policy has presented very little problems for an employer like the State of Illinois").

[29]S. Rep. No. 103-3, at 12-14, 16-18 (1993), reprinted in 1993 U.S.C.C.A.N. 3, 14-16, 18-21 (noting testimony of small business owners, governmental employers, and chief executive officers, as well as numerous workplace studies by governmental bodies and private institutes; for example, Aetna Life and Casualty Company reportedly saved $2 million in 1991 by reducing employee turnover through implementation of family leave policy, and a study by the Small Business Administration concluded that providing family and medical leave cost employers a minimal $6.70 annually per covered employee); The Family and Medical Leave Act of 1991: Hearing on S. 5 Before the Subcomm. on Children, Family, Drugs and Alcoholism of the Senate Comm. on Labor and Human Resources, 102d Cong. 12, 13, 23, 35, 91 (1991) (noting studies indicating that cost of providing leave would be as inexpensive as $5.30 per employee, on an annual basis).

deal of deference, inasmuch as Congress is an institution better equipped to amass and evaluate the vast amounts of data bearing on such an issue." Walters v. National Ass'n of Radiation Survivors, 473 U.S. 305, 330 n.12 (1985).

Importantly, the FMLA contains a mechanism for reviewing its effectiveness and the burden that it imposes on employers by creating a Commission on Leave to study actual costs and benefits of the Act and report to Congress two years after enactment. 29 U.S.C. § 2632. This represents another distinguishing feature from the RFRA, which the Supreme Court criticized for having no time or enforcement limitations.[30] Flores, 521 U.S. at 532-33. Contrary to the speculation concerning costs in which the Thomson, McGregor, and Driesse courts indulged, the Commission has found that the vast majority of work sites (between 89.2% and 98.5%) reported little or no cost from FMLA compliance in four broad survey areas.[31]

Contrary to the position taken in McGregor, 18 F. Supp. 2d at 209-10, the FMLA's failure to require a specific finding of discriminatory intent on the part of the employer is not necessarily sufficient to invalidate it. Legislation passed by Congress to combat discrimination through enforcement of the Equal Protection Clause does not

---

[30]The Supreme Court was careful to clarify that "[t]his is not to say, of course, that § 5 legislation requires termination dates, geographic restrictions or egregious predicates." Flores, 521 U.S. at 533.

[31]Commission on Leave, United States Dep't of Labor, A Workable Balance: Report to Congress on Family and Medical Leave Policies 125-26 (1996).

always require a showing of discriminatory animus.  See Alexander v. Choate, 469

U.S. 287, 295-97 (1985).  Congress, pursuant to the Fourteenth Amendment, may

"prohibit laws with discriminatory effects in order to prevent . . . discrimination in

violation of the Equal Protection Clause."  Flores, 521 U.S. at 529.  This is because,

as it is generally understood, the Fourteenth Amendment empowers Congress to enact

appropriate legislation establishing more exacting requirements than those minimum

safeguards provided in the amendment.  See Fullilove v. Klutznick, 448 U.S. 448,

477, (1980) (plurality opinion); City of Rome, 446 U.S. at 177; Morgan, 384 U.S. at

648-51.

> A construction of § 5 that would require a judicial determination that the
> enforcement of the state law precluded by Congress violated the
> Amendment, as a condition of sustaining the congressional enactment,
> would depreciate both congressional resourcefulness and congressional
> responsibility for implementing the Amendment.  It would confine the
> legislative power in this context to the insignificant role of abrogating
> only those state laws that the judicial branch was prepared to adjudge
> unconstitutional, or of merely informing the judgment of the judiciary by
> particularizing the "majestic generalities" of § 1 of the Amendment.

Morgan, 384 U.S. at 648-49 (footnote omitted).

Given Congress' findings about the continuing pervasive problem of sex

discrimination in the offering of employee leave time despite its previous legislative

attempts to combat that problem through less burdensome legal prohibitions, the

FMLA cannot be considered "so out of proportion to a supposed remedial or

46

preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." Flores, 521 U.S. at 532. The widespread nature of the problem that Congress hoped to address through the FMLA, and prior unsuccessful legislative efforts to provide effective protections, justify Congress' imposition of an affirmative duty upon covered employers, particularly because § 5 legislation does not require "egregious predicates." Flores, 521 U.S. at 533. Rather, the FMLA is at the least broadly appropriate "in light of the evil presented," based on the " 'historical experience . . . it reflects,' " Flores, 521 U.S. at 525, 530 (quoting South Carolina v. Katzenbach, 383 U.S. 301, 308 (1966)), particularly since it contains the types of measured limitations on coverage and enforcement that "tend to ensure Congress' means are proportionate to ends legitimate under § 5," Flores, 521 U.S. at 533. Consequently, given that the FMLA is not subject to the concerns the Supreme Court espoused in Flores, this tribunal should defer to Congress' judgment that the Act is an appropriate measure to protect the citizenry from unconstitutional sex discrimination in employment. "It is for Congress in the first instance to 'determin[e] whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment,' and its conclusions are entitled to much deference." Flores, 521 U.S. at 536 (quoting Morgan, 384 U.S. at 651).

## III.

Accordingly, for the reasons that I have explained above, I concur to the extent that the decision below, as it respects the ADA and Section 504 of the Rehabilitation Act, must be reversed due to this circuit's intervening decision in Kimel v. State of Florida Board of Regents, 139 F.3d 1426 (11th Cir. 1998).

However, I would hold that Congress validly abrogated the States' Eleventh Amendment immunity through passage of the FMLA, and thus respectfully dissent on that issue.